**Kimberly D. DAMERON and Lowell R. Gasaway, Plaintiffs,**

v.

**CITY OF SCOTTSBURG, INDIANA, and First Christian Church, Inc., of Scottsburg, Indiana, Defendants.**

**No. NA97–110–C H/G.**

United States District Court, S.D. Indiana, New Albany Division.

Dec. 18, 1998.

Donald R. Forrest, Scott & Forrest, New Albany, IN.

Joseph B. Roberts, III, Roberts & Rhodes, Gastonia, NC.

Richard T. Mullineaux, Kightlinger & Gray, New Albany, IN.

James S. Stephenson, Stephenson Daly Morow & Kurnik, Indianapolis, IN.

## ENTRY ON DEFENDANT CITY OF SCOTTSBURG'S MOTION FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

On June 30, 1995, six-year-old Briana Gasaway drowned in the Scottsburg City swimming pool. She drowned while visiting the pool with a day care program run by the First Christian Church, Inc. of Scottsburg, Indiana. Briana's parents, Kimberly D. Dameron and Lowell R. Gasaway, have sued both the City of Scottsburg and the First Christian Church for the wrongful death of their daughter.

Defendant City of Scottsburg has moved for total summary judgment on the theory that the City owed no special or private duty to the plaintiffs or to Briana to prevent Briana's drowning or to provide rescue services. The City also moves for partial summary judgment on several issues, contending that the undisputed facts show: (1) the City was not negligent in its pool design because the City provided a wading pool for children and non-swimmers; (2) the Church's day care personnel's failure to require Briana to use the wading pool constituted an intervening cause of her drowning; (3) Lowell Gasaway's claim is barred because he did not file his own timely notice of tort claim as required by the Indiana Tort Claims Act; and (4) the Indiana Tort Claims Act limits plaintiffs' recovery from the City to a total of $300,000

for the death of Briana, rather than $300,000 per parent.

As explained below, the City is not entitled to summary judgment on the theory that it owed no special duty to Briana or her parents. In addition, genuine issues of fact will require a trial on the issues of negligent design of the pool and an intervening cause of Briana's death with respect to the pool design. The City is entitled to summary judgment, however, on plaintiff Gasaway's claim because he failed to provide notice required under the Indiana Tort Claims Act. That conclusion renders moot the City's final theory based on the Tort Claims Act recovery limitation. The City's motion for summary judgment therefore is granted in part and denied in part.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, the court should grant summary judgment if and only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

On a motion for summary judgment, the moving party must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the party believes demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party has met the threshold burden of supporting the motion, the opposing parties must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Not all factual disagreements are material. Factual disagreements that are irrelevant or immaterial under the applicable substantive law do not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Local Rule 56.1, the parties opposing the motion must identify specific and material factual disputes. The non-moving parties "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [they] must go beyond the pleadings and support [their] contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir.1997); *Collier v. Budd Co.*, 66 F.3d 886, 892 & n. 8 (7th Cir.1995) (evidence must be admissible at trial).

In reviewing the parties' submissions, the court must consider the evidence in the light reasonably most favorable to the non-moving parties. The issue is whether a rational trier of fact could reasonably find for the parties opposing the motion with respect to the particular issue. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 512 (7th Cir.1996). The court is not required to draw every conceivable inference in the opposing parties' favor, but only those that are reasonable. *Greenslade v. Chicago Sun–Times, Inc.*, 112 F.3d 853, 857 (7th Cir.1997). The court should neither "look the other way" to ignore genuine issues of material fact nor "strain to find" material factual issues where there are none. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1363–64 (7th Cir.1988). Summary judgment is not a substitute for a jury's determinations about the credibility of testimony or the reasonableness of actions and decisions. At the same time, summary judgment is not a disfavored shortcut, but an essential part of the Federal Rules of Civil Procedure. Summary judgment is not discretionary; when a party is entitled to judgment as a matter of law, summary judgment must be granted.

### Undisputed Facts

Based on this standard, the following facts are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiffs Dameron and Gasaway. Briana was born on August 13, 1988. Her parents, Kimberly D. Dameron and Lowell R. Gasaway, were divorced in 1994 in North Carolina. Dameron was awarded legal custody of Briana; Gasaway had visitation rights. On June 29, 1995, Briana began her two-week summer visitation with Gasaway and

came to Indiana to visit family. That evening, Lowell Gasaway's sister, Eveling Gasaway, asked him to let her take Briana swimming with the day care center at First Christian Church, Inc., where she was employed. After Eveling assured Lowell Gasaway that there would be "lifeguards at the pool," that "counselors [would] be there," and that Briana would be "watched constantly," Gasaway gave his permission for Eveling to take Briana swimming the next day. Lowell Gasaway Dep. 48, 154. Eveling then obtained permission from Jan Beltz, the director of the Church, to bring Briana to the City pool the next day as a guest. Beltz Dep. 36; Eveling Gasaway Dep. 44.

At the beginning of the 1995 pool season, Beltz had made arrangements with Larry Bower, the City's park director, for the Church day care to hold private pool parties on Fridays at the City pool. The Church's pool time lasted from 10:30 a.m. to 12:00 p.m. before the pool opened to the general public at 1:00 p.m. Bower required the Church day care to use the city lifeguards, one for each twenty children. The Church paid the City $13.00 per session, which the pool personnel turned in to city hall. The City then paid the lifeguards for the hours they worked each week. Bower Dep. 18–20. The Church paid for the session on June 30, 1995. Beltz testified that she would not have allowed the children to go to the pool if the City had not provided lifeguards: "Because the lifeguards are there to provide the duty of watching the children when they're in the pool. They're trained for the lifesaving. I mean, that is what they're trained for, when the children are in the water." Beltz Dep. 44.

On the morning of June 30, 1995, 29 children from the day care program, including Briana, arrived at the pool. Their ages ranged from six to eight or nine years old. The children were accompanied by five day care staff members. As a day care guest, Briana was allowed to participate fully in the group's activities. Briana's parents described her as a "marginal" or "non-swimmer." Dameron Dep. 63–67, 72–75; Lowell Gasaway Dep. 56–57, 62–64.

The pool managers had failed to provide lifeguards for the day care pool party on June 30th. Head lifeguard Jason King, who was not scheduled to work that day, was on his way to the bank to cash his paycheck when he saw the day care children walking to the pool. On his way back from the bank, he saw the children waiting at the pool. He opened the pool enclosure and called for lifeguards to come in because the Church had paid for the Friday session. At King's request, Jason Corbin, a lifeguard and the assistant pool manager, and Corey McNeely, a first year lifeguard, agreed to come in and work. Both Corbin and McNeely were lifeguards certified by the Red Cross.

The City pool is T-shaped. The water depths in the shallow part range from 3½ feet to 5 feet, and the diving well is 12 feet deep. There was no safety line or rope separating the shallower part of the pool from the deeper part. There were elevated lifeguard chairs at the northwest corner of the deep well, at the east and west ends of the shallow well, and in the middle of the north side of the shallow well. On the morning of June 30, 1995, lifeguard Corbin was located at the deep well of the pool. Rather than using the elevated lifeguard chair, he stood next to the chair. Lifeguard McNeely was located at the shallow end of the pool. McNeely also failed to use the lifeguard chair. Instead, he sat on a bench that was approximately nine feet from the pool, McNeely Dep. 25–26, 35, Ex. 1. Also, McNeely testified that during at least part of the relevant time, he was lying on his stomach on the bench. Id. at 25–26.

That morning Eveling Gasaway spent time in the shallow part of the pool with Briana. She observed Briana swimming and ensured that she was comfortable in the water. Eveling allowed Briana to go with two other children in the shallow well of the pool, and Eveling then checked on other day care children and other day care staff workers at the pool. After a period of time, Eveling observed McNeely lying on the bench and began to question whether he was a lifeguard and whether he was performing his lifeguard duties. Eveling swam to where Peggy Cool, a Church staff member, was located and discussed whether the person lying on the bench was their lifeguard. Eveling then returned to the middle of the pool to discuss

this situation with Carolyn Duvall, another Church staff member. Eveling decided that she would approach McNeely, and she began to walk toward the edge of the pool.

At this point, Duvall observed Briana face down at the bottom of the pool approximately in the middle of the shallow well. Duvall nudged Briana with her foot, and Briana did not move. Duvall then picked up Briana to get her head out of the water, yelled for help, and brought her to the side of the pool. Briana's lips were "bluish" and her skin was "grayish." Duvall Dep. 46. At no time did Briana cough, splutter, or make any movement. Id.

McNeely's first awareness of any problem was when he heard someone say "We've got one." McNeely Dep. 26. Corbin immediately placed an emergency 911 call after he heard Duvall's cries of distress and observed Briana being lifted out of the water. McNeely began administering CPR and after about 15 seconds was relieved by YMCA director Jonathan Hill. Hill Dep. 13. An EMS unit arrived at the pool three minutes after it received the 911 call. EMS technician Patty Fiscus checked Briana, but could not find a pulse. Fiscus Dep. 26. Briana was "gray, ashen colored." Id. at 25. They continued CPR but received no response. Briana was transported by ambulance to Scott County Hospital where she was later pronounced dead.

Dr. Barbara Weakley–Jones performed an autopsy and determined that Briana's cause of death was drowning. Dr. Weakley–Jones ruled out any medical condition that might have caused Briana to lose consciousness or to be in a position where she could no longer swim or care for herself in the water. Weakley–Jones Dep. 11.

Dameron and the Estate of Briana Gasaway served a tort claim notice upon the City on October 4, 1995, in accordance with the Indiana Tort Claims Act. Plaintiff Lowell Gasaway is not identified in the tort claim notice and did not file his own notice within the statutory 180–day limit. See Ind.Code § 34–4–16.5–7 (1995); Ind.Code § 34–13–3–8 (1998).[1]

Plaintiffs have offered as evidence a report from Frank Pia, a former chief lifeguard in New York City and author of the American Red Cross training manual "Lifeguarding Today" chapters "Aquatic Injury Prevention," "Patron Surveillance," and "Facilities Surveillance." Pia contends that the City failed to provide the following proper or standard lifeguarding services to the day care group on June 30, 1995:

1. Failure to place buoyed safety lines for the day care center children.

2. Failure to properly position lifeguards.

3. Failure to properly supervise lifeguards.

4. Failure to implement the American Red Cross communication strategy.

5. Failure of lifeguard McNeely to recognize Briana's distress.

6. Failure of lifeguard McNeely to recognize Briana's "Instinctive Drowning Response."

7. Failure of lifeguard McNeely to recognize Briana's passive drowning.

Pl. Expert Witness Discl. at 7.

Several witnesses testified that McNeely's position on the bench constituted improper surveillance for a lifeguard. Corbin testified that it was not permissible for a lifeguard to lie on a bench, that his ability to maintain a proper surveillance would be hampered, and that pool surveillance by a lifeguard includes observing the bottom of a pool. Corbin Dep. 42–44. Pia testified that a lifeguard positioned on a bench nine or ten feet from the pool was improperly positioned: "There is no indication that Corey McNeely, from his position, could have maintained adequate surveillance of the shallow end of the pool, as was intended by the American Red Cross, the YMCA, or the State of Indiana. He was not able to maintain surveillance over the pool from that position." Pia Dep. 130. Dan

---

1. The Indiana Tort Claims Act was recodified in 1998. See Pub.L. No. 1–1998, § 221, 1998 Ind. Acts 534 (repealing Indiana Code 34–4 effective July 1, 1998); id., § 8 at 53 (recodifying the Tort Claims Act at Indiana Code §§ 34–13–3–1 to –25 effective July 1, 1998). The recodification did not effect any substantive change in existing law. *Budden v. Board of School Comm'rs of City of Indianapolis,* 698 N.E.2d 1157, 1161 n. 5 (Ind. 1998).

Kamp, Ph.D. is Chief of Operations for the Kansas City Parks, Recreation and Boulevards Department, with jurisdiction over 19 swimming pools, and teaching and management experience in supervising lifeguard training. Dr. Kamp testified that it was "totally inappropriate" for a lifeguard to be maintaining pool surveillance while lying on a bench. Kamp Dep. 201. Finally, Steve Bernheim, the sports and recreation consultant for the Church, testified: "There was also the agreement, whether it was a contract or not, an agreement with the City, to provide two lifeguards ... and that they be in a proper position. A proper position is not either lying or sitting on a bench 16 inches high, nine to 10 feet away from the pool surface. The proper position is either walking the surface of the pool [sic] in the area that he's observing or to be in the chair." Bernheim Dep. 94.

Pia also explained grounds for concluding that the City was negligent on the morning of June 30, 1995. Because the autopsy found that Briana's death was consistent with drowning, Pia opined that Briana had been an "active drowning person," meaning that she struggled on the surface of the water for 20 to 60 seconds, before she became a "passive drowning person" who, because of physiological reasons, slips below the surface of the water. In Pia's opinion, if lifeguard McNeely had been attentive and properly positioned, he would have recognized Briana's distress and drowning and could have rescued her before she submerged. Pia Dep. 125. Pia testified "there was no reason, given the number of youngsters in the pool, given the extremely small area that he had to maintain surveillance over, that if he was properly positioned in the chair, or if he was on a walking patrol, facing the water, looking at the youngsters, there is absolutely no reason why he should not have been able to detect this youngster's peril at multiple points." Id. at 127. "You don't need special training to realize that somebody who is lying on the bottom of the pool motionless is in trouble." Id. at 126.

Pia explained in more detail what the lifeguard should have done:

> If that scenario occurred, okay, and she was in, you know, water where she could stand, if she is exhibiting the instinctive drowning response, a lifeguard has a duty to recognize it. If he misses the instinctive drowning response and looks at it, in this particular case and says "That kid is playing," turns away and comes back and sees the kid on the bottom of the pool, he doesn't need really special training. All he has to do is say, "My God, we've got a little kid lying on the bottom of the pool. Now, is she playing a game or not? Let me just look at her and look at her and look at her." And as soon as he gets up to around 10 or 15 seconds, he should be alarmed. When he gets to 20 seconds, he should be petrified. 30 seconds, he's in there. And 30 seconds is the max.
>
> In this particular case, it should have been faster. So those—you know, regardless of how she got there, regardless of what the cause was, there was a duty to recognize this youngster's peril, get in there, get her up, and get her above the surface of the water within a set period of time, which would be 40 seconds, max. If that occurs, you have a youngster who, in all likelihood, still has respiration and definitely has a pulse. So all you're doing at that point is ventilating, if need be.

Id. at 141–42.

Pia testified that if McNeely had been in the elevated lifeguard chair and had been paying attention, "the worst that would have happened was that he would have seen Briana Gasaway motionless on the bottom of the pool within the 20 seconds." Id. at 143. Frederick Carter, the City's lifeguarding expert, testified that in his opinion Briana had been under water between four and fifteen minutes. Carter Dep. 74.[2] Additional facts are set forth below as needed, using the same standard for a motion for summary judgment.

---

**2.** Carter explained that the chances of recovery are greatest when the victim has been under water for less than four minutes. Carter Dep. 74. Dr. Weakley–Jones also testified that the victim might be resuscitated after eight minutes of being under water, but that irreversible brain damage usually begins after three to five minutes. Weakley–Jones Dep. 13–14.

### Discussion

Plaintiffs Dameron and Gasaway have sued both the City of Scottsburg and the First Christian Church pursuant to Ind.Code § 34-1-1-8 for the wrongful death of a child. Under the statute governing such claims, the father and mother "jointly," or in the case of divorce, "the person to whom custody of the child was awarded," may maintain an action for the injury or death of a child. Ind.Code § 34-1-1-8(b)(1) & (2) (1995).[3] Indiana law governs all the issues raised by the City's motion for summary judgment.

### I. The City's Duty to Briana

To establish liability for negligence, a plaintiff must establish three elements: (1) that the defendant owes the plaintiff a duty to conform its conduct to a standard of care arising from its relationship with the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by that breach. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). For purposes of its motion for summary judgment, the City effectively concedes that there is evidence from which a jury could reasonably find that the City lifeguards were negligent the day that Briana drowned, and that the negligence proximately caused her death. The City argues, however, that it and its lifeguards owed no legal duty to Briana to use reasonable care to protect her. The court disagrees.

The existence of a duty is a question of law for the court. *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 283 (Ind.1994). In determining whether a duty exists, a court will consider three factors: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Id.*, following *Webb*, 575 N.E.2d at 995.

Indiana negligence law distinguishes between duties that a government owes to the public at large and duties owed to particular individuals or groups of individuals. State and local governments operate a wide variety of public services to protect the public from a host of dangers. Those public services may be provided by police and fire departments, ambulance services, emergency management agencies, park rangers, and so on. By operating such services, governments do not become guarantors or insurers of public safety. The Supreme Court of Indiana therefore holds that a governmental entity is not liable for negligence for breach of a duty owed only to the public at large. *Mullin*, 639 N.E.2d at 283. The plaintiffs therefore must show that the City breached a "private" duty that it owed to Briana. See *id.* (plaintiff must show private duty owed to particular individual), citing *Greathouse v. Armstrong*, 616 N.E.2d 364, 368 (Ind.1993). A private duty must be "particularized to an individual." *McCormick v. State*, 673 N.E.2d 829, 838 (Ind.App.1996) (state owed only a general duty to public at large with respect to dangers surrounding water reservoir and spillway).

In *Mullin v. South Bend*, the Supreme Court of Indiana adopted a three-part test for determining whether a governmental defendant owed a private duty to a plaintiff. The plaintiff must show:

1. an explicit assurance by the municipality, through promises or actions, that it would act on behalf of the injured party;

2. knowledge on the part of the municipality that inaction could lead to harm; and

3. justifiable and detrimental reliance by the injured party on the municipality's affirmative undertaking.

639 N.E.2d at 284. The facts in *Mullin* illustrate this test. After the Mullin home caught fire, a neighbor called the 911 emergency dispatcher to report the fire. The dispatcher asked whether anyone was inside the house, and the neighbor responded, "I think so." Although the city's policy was to dispatch an ambulance on fire calls if "someone is thought to be inside," the dispatcher called for fire trucks but not for an ambu-

---

**3.** The 1998 act recodifying portions of Title 34 of the Indiana Code also repealed Ind.Code § 34-1-1-8 and added a new version as Ind.Code § 34-23-2-1, effective July 1, 1998. See Pub.L. No. 1-

1998, § 18 (adding new section effective July 1, 1998); id., § 221 (repealing prior version effective July 1, 1998). The court applies the version of the statute in effect at the time Briana died.

lance. Fire trucks arrived moments later. The firefighters then called for ambulances, which arrived in a few minutes. One child died as a result of the fire. Another was injured.

Applying the three-part test, the Supreme Court found in *Mullin* that the city had no private duty to dispatch an ambulance in response to the neighbor's call. There was no evidence that the city had assured anyone that an ambulance would be dispatched immediately. There was no evidence of any detrimental reliance on an expectation that an ambulance would be dispatched immediately with the fire trucks. There was no evidence that the Mullin family was aware of any city policy governing the dispatch of ambulances. 639 N.E.2d at 285.

As applied to this case, however, there is ample evidence to support a conclusion under the *Mullin* test that the City of Scottsburg undertook a private duty toward Briana and other children using the swimming pool. With respect to the first *Mullin* factor, evidence shows that the City made an explicit assurance that it would act on behalf of Briana and other children in the program. The City did not merely place lifeguards at the pool. The City contracted with the Church to allow the Church to have private pool parties for the day care program at times when the pool was still closed to the general public. The Church contracted with the City to pay the City $13 per session for use of the pool and for lifeguarding services. In fact, the Church's sports and recreation consultant, Bernheim, testified that the City and Church had entered into this agreement: "There was also the agreement, whether it was a contract or not, an agreement with the City, to provide two lifeguards ... and that they be in a proper position." Bernheim Dep. 94. The City of course did not guarantee successful rescue attempts. Nevertheless, by requiring the Church to pay a fee for use of the pool and for lifeguarding services for a private party, the City was assuring the Church that qualified lifeguards would be present and would use reasonable care to observe swimmers and assist those in distress.

The second *Mullin* factor, that the City must have known that inaction could lead to harm, is clearly satisfied here. The City knew that an inattentive and improperly positioned lifeguard could lead to harm to the children in the pool. If specific evidence of this obvious point were needed, lifeguard Corbin testified that it was not permissible for a lifeguard to lie on a bench and that his ability to maintain a proper surveillance over the pool would be hampered. Corbin Dep. 42–44.

Plaintiffs have also come forward with evidence supporting the third *Mullin* factor— that the people who were responsible for Briana justifiably relied on the City's assurances that lifeguards would be present and would perform their duties with reasonable care. Beltz, the Church's day care director, testified that she would not have allowed the children to go to the pool if the City had not provided lifeguards: "Because the lifeguards are there to provide the duty of watching the children when they're in the pool. They're trained for lifesaving. I mean, that is what they're trained for, when the children are in the water." Beltz Dep. 44.

Generally, guests at a pool rely on lifeguarding services at least to some extent when they see a lifeguard sitting on a lifeguarding chair. If guests were not expected to rely on lifeguards to perform their jobs, there would be no need to place "Warning— No Lifeguard on Duty" signs at pools when lifeguards are not present. A person who is supervising children in a pool and who knows that no one else is watching them can reasonably be expected to approach the responsibility differently than she would if a lifeguard were present. When a lifeguard is present but is not paying attention, the situation therefore can be more dangerous than if no lifeguard were present. The Church was entitled to rely to at least some degree on the City's assurance that the lifeguards would perform their duty to observe the pool because it contracted for the services of the City lifeguards and paid for their services.[4]

4. The court is not suggesting that the mere presence of the lifeguards relieved the Church of all duties toward the children in the day care program.

Plaintiffs have provided evidence that they also relied on this assurance. Dameron had legal custody of Briana, but when she visited the pool, Briana was in Lowell Gasaway's care for purposes of visitation. Gasaway testified that he allowed Briana to attend the pool party because his sister Eveling Gasaway assured him that lifeguards and counselors would be at the pool and that Briana would be watched "constantly." Lowell Gasaway Dep. 46–48.

Thus, under the *Mullin* test, because the City contracted with the Church to allow the Church to have private pool parties, because it required that City lifeguards be on duty during these parties, because the risks to children from poor supervision were obvious, and because evidence tends to show that the Church and Gasaway relied on the presence of the lifeguards, the City owed a private duty to the Church day care program to have its lifeguards use reasonable care to observe the pool and patrons and come to their assistance when needed. Briana was a guest of the Church day care, so this duty extended to her.

Despite these facts, the City argues that it owed no special or private duty to Dameron, Gasaway, or Briana to use reasonable care to prevent Briana's drowning or to provide rescue services. The City bases its argument on three Indiana cases. Two do not support the City's position as applied to the facts of this case, and the third has been vacated by the Supreme Court of Indiana.

The first case the City relies upon is *City of Evansville v. Blue*, 212 Ind. 130, 8 N.E.2d 224 (1937). In that case a boy drowned while swimming at a pool in a municipal park. The Supreme Court of Indiana reversed a judgment in favor of the boy's family. The court discussed the issue of duty at some length. Ultimately, however, the court concluded that it was "not necessary to determine the measure of the city's duty." 8 N.E.2d at 231. The court rejected the argument that the doctrine of res ipsa loquitur applied to prove negligence. The court then concluded the plaintiff simply had not come forward with evidence to show the proximate cause of the boy's death, so there was "no evidence upon which it could have been determined that his

death was proximately caused by the negligence of the city or its servants, even though the city had a duty to use reasonable care to protect him from his own negligence." *Id.*

In *Evansville v. Blue*, the city government had made the pool available to the general public and had provided lifeguards to look after the swimmers. 8 N.E.2d at 226. Evidence tended to show that two lifeguards were present but "did not stay at the water all the time" and did not always pay close attention to the swimmers in the pool. See *id.* The opinion does not indicate that the boy or other swimmers paid any admission charge to swim at the pool. In fact, the court framed the issue of duty in terms of "one who voluntarily undertakes to gratuitously supervise boys of ten or twelve years on a swimming or fishing expedition...." *Id.* at 229 (emphasis added). The court also distinguished a Louisiana case finding in favor of a swimmer's family on the ground that the swimmer in the Louisiana case had paid an admission charge, thus creating a "contractual relationship which we do not have here." *Id.*, distinguishing *Rome v. London & Lancashire Indemnity Co.*, 169 So. 132, 141 (La.App.Orleans 1936).

The City relies on the following language from *Evansville v. Blue*:

The practice of providing artificial pools, or of preparing bathing beaches in natural lakes or streams, so as to induce children of the community to come to them, may well have for one of its purposes the protection of children from the perils of natural streams and water courses where water is of fluctuating depth and where there is a possibility of unsuspected currents and dangers from sudden depths. There is some difficulty in concluding that, because a municipal corporation, in the public interest and for the protection of the young, furnishes them a place to swim, safer than a natural stream or lake, and furnishes some supervision or policing, and guards to protect against the danger of drowning, which is inherent in swimming, it should be held responsible for unfortunate accidents because it has gone but part way and not

furnished complete protection against drowning.

8 N.E.2d at 228. In this and accompanying passages, the court made it clear that a municipal government does not become an insurer of the safety of swimmers.

The *Evansville v. Blue* court did not conclude, however, that a municipal government owes no "private duty" toward swimmers to use reasonable care. In fact, the court suggested that the municipal government might well have a private duty toward swimmers in circumstances like those shown in this case. After pointing out that the boy who drowned might have been negligent himself, the court said:

> But there may be a duty by contract, express or implied, to protect children against their own voluntary negligent acts. Where there is such a duty, reasonable care to so protect must be exercised, and a failure to use such reasonable care may be actionable negligence. But even in such a case there is no insurance against injury, and it is not contended here that the city is an insurer.

8 N.E.2d at 229. Plaintiffs have come forward with evidence here not only of negligence but also of a contract in which an implied term was that lifeguards would be present for the Church's swimming parties and would exercise reasonable care to protect the safety of the young children. *Evansville v. Blue* does not show that the City owed no private duty to Briana.

■ The City also relies on two recent decisions by the Court of Appeals, *Plummer v. Board of Comm'rs of St. Joseph County*, 653 N.E.2d 519 (Ind.App.1995), and *Benton v. City of Oakland City*, 684 N.E.2d 251 (Ind.App.1997), transfer granted, 698 N.E.2d 1186, 1998 WL 398546 (Ind. Mar. 12, 1998) (table). In a diversity case, this court's obligation is to use its best judgment to apply the rules of law that the Supreme Court of Indiana would apply. *E.g.*, *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 719 (7th Cir.1994). Decisions of the Indiana Court of Appeals of course are vital, often decisive indicators of Indiana law, and demand this court's careful attention. See *General Accident Ins. Co. of Am. v. Gonzales*, 86 F.3d 673, 675 (7th Cir.

1996) (when the Supreme Court of Indiana has not addressed an issue, the decisions of the Indiana Court of Appeals provide a "strong indication of how it believes the Supreme Court would decide a similar question, unless there is a persuasive reason to believe otherwise"); *Trytko*, 28 F.3d at 719.

■ Decisions of intermediate courts of appeals are not binding, however, if the federal court concludes that there is good reason to believe such decisions do not reliably indicate how the state's supreme court would decide the issue. See, *e.g.*, *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Insurance Group*, 750 F.2d 619, 624 (7th Cir.1984) (declining to follow decisions of intermediate court of appeals in Illinois); *Yasuda Fire & Marine Insurance Co. v. Lake Shore Electric Corp.*, 744 F.Supp. 864, 871 n. 5 (S.D.Ind.1990) (declining to follow decision of Indiana Court of Appeals that appeared to be contrary to statutory language). As explained below, after careful consideration of the Indiana cases in this area, this court believes that the Supreme Court of Indiana would recognize a private duty under the circumstances here, notwithstanding the language in *Plummer* and *Benton* cited by the City.

In *Plummer*, lifeguards at a public lake immediately initiated a rescue attempt when a lifeguard heard yelling and saw bubbles in the water. Although the lifeguards found the boy and repeatedly tried to revive him, the boy died. The appellate court affirmed summary judgment for the defendant county government, but there is some room for argument about the precise basis for the decision. The most persuasive basis is simply that the boy's family produced no evidence of negligence. The lifeguards saw the boy in distress and responded immediately, but were unsuccessful. Lifeguards are not and cannot be insurers of the safety of swimmers. 653 N.E.2d at 522–23. The plaintiffs argued that the lifeguards failed to follow a county policy that required the use of face masks for better visibility in rescue searches. Applying the three-part test in *Mullin*, however, the appellate court said there was no evidence that the boy had known about the policy or

that he had detrimentally relied on it. *Id.* at 523.

The court in *Plummer* appears also to have based its decision at least in part on the issue of duty. The plaintiffs in *Plummer* argued that the county, by placing lifeguards at the lake and charging admission, had implicitly assured swimmers that the lifeguards would react to emergencies with reasonable care. The plaintiffs argued that those assurances satisfied the *Mullin* test and showed that the county had undertaken a private duty toward swimmers. *Id.* The *Plummer* court rejected that argument. The court cited *Evansville v. Blue* to support the conclusion that the county had not undertaken any private duty toward swimmers. *Id.* The court quoted the lengthy passage quoted above at page 830, from 8 N.E.2d at 229, and said that *Evansville v. Blue* "confirms that a lifeguard does owe a duty to the public at large to help imperiled swimmers." 653 N.E.2d at 523, citing 8 N.E.2d at 228–29. The *Plummer* court also acknowledged that *Evansville v. Blue* recognized that a duty may arise out of an express or implied contract, but that a lifeguard "is not ... and cannot possibly be an absolute insurer of the safety of swimmers." 653 N.E.2d at 523. In a footnote concerning a possible contractual duty, the *Plummer* court said that "a private duty does not arise solely from the fact that a fee was charged to Jamie to use the lake." *Id.* at 523 n. 2, citing *Cain v. Board of Comm'rs of Cass County*, 491 N.E.2d 544, 548 (Ind.App.1986).[5]

This court cannot disagree with the result in *Plummer*. There was little or no evidence showing negligence on the part of the lifeguards in that case. But to the extent that

Plummer held that a municipal government accepts no private duty by providing lifeguards at a swimming pool or lake where it posts lifeguards and for which it charges admission, this court does not believe *Plummer* accurately interprets *Mullin v. South Bend* or *Evansville v. Blue.*

Specifically, *Evansville v. Blue* made it clear that providing lifeguards did not transform a city into an insurer, but the Supreme Court explicitly declined to resolve the precise extent of the city's duty to swimmers, which was the point for which the *Plummer* court cited it. The court in *Evansville v. Blue* actually held that the plaintiffs had simply failed to establish that any negligence had proximately caused the death of the boy. See 8 N.E.2d at 231. In addition, *Mullin's* three-part test for finding a private duty easily fits a situation where a local government provides lifeguards for swimmers, especially where it charges admission for swimming.

 The *Plummer* court's concern with avoiding turning local governments and lifeguards into insurers is readily understandable. In the absence of a governing statute, the choice of a common law rule is not limited, though, to a choice between a local government owing no private duty at all toward swimmers in this situation and the local government becoming an insurer. The middle ground—a private duty to use reasonable care—is exemplified by plaintiffs' evidence in this case. That evidence tends to show that the closest lifeguard simply was not in position to be able to carry out his most basic duty, to watch the young children in the swimming pool. This court therefore be-

---

5. The facts related to the admission fee in *Cain* 02 were significantly different. In that case the plaintiff had paid an admission fee to a county park that included the shore of an old quarry that had filled with water. The county provided a roped-off swimming area. The plaintiff and friends saw others diving into the quarry from higher cliffs that were outside the park, on private land. 491 N.E.2d at 546. They walked to those cliffs outside the park. When the plaintiff dove in, he suffered a head injury that rendered him quadriplegic. The Indiana Court of Appeals in *Cain* rejected what it called "a confused argu-

ment" regarding duty based on the entrance fee to the park. *Id.* at 548. It is difficult to see how any government would, by accepting an admission fee to a park, incur a private duty toward park visitors who have left the park. The opinion in *Cain* does not seem to support the broad conclusion that a government may charge an admission fee for a recreational area without incurring any private duty toward visitors. Cf. *City of Evansville v. Blue*, 8 N.E.2d at 229 (Supreme Court of Indiana distinguishes Louisiana case that had applied doctrine of res ipsa loquitur to drowning in municipal pool; the swimmer in the Louisiana case had paid an admission

lieves that the Supreme Court of Indiana would probably hold that a local government, by providing lifeguards and charging admission to a pool or lake, undertakes a private duty toward swimmers to use reasonable care to protect them. That rule of law is consistent with the duties owed by private entities that provide swimming facilities, and it tailors the general standard adopted in *Mullin* to fit the specific context of swimming facilities and lifeguards.[6]

Even if *Plummer* accurately stated the law of Indiana on this issue of private duty, however, plaintiffs in this case have come forward with evidence tending to show a private duty that went well beyond the evidence in *Plummer*. The court has described above the specific contractual arrangement between the Church and the City for what amounted to private swimming parties for the day care program with a specific fee charged for the group and the specific agreement by the City to provide lifeguards for the swimming parties. Those facts are sufficient to distinguish this case from *Plummer* even if that case properly interpreted *Mullin v. South Bend* and *Evansville v. Blue*.

The City also relies on *Benton v. Oakland City*, where the plaintiff had been swimming at a public swimming area operated by the city. While the plaintiff was in an adjacent parking lot, he heard people shouting his nephew's name. His nephew was not surfacing from the water. The plaintiff responded by running down an embankment from the parking lot and diving into the water to search for him. The plaintiff dove into shallow water, immediately struck bottom, and broke his neck. 684 N.E.2d at 252. The appellate court affirmed summary judgment for the defendant city. The court quoted the private duty test adopted in *Mullin*, then cited *Plummer* as holding on similar facts "that the governmental entity did not owe a private duty to the decedent." *Id.* at 253. The *Benton* court relied on evidence that the plaintiff had not spoken with the lifeguards but had only paid them the admission fee to swim there. There was no evidence that the city "made any promises or assurances that it would act on behalf of Jason individually," so "there can be no reliance." *Id.*[7]

From the account of the facts in *Benton*, it is difficult to see how the city might have been negligent toward the plaintiff. The plaintiff was responding to a perceived emergency, ran down toward the swimming area, and dove in. It is not apparent from the opinion what actions a lifeguard might have taken to stop the plaintiff. The appellate

---

charge, giving rise to a contractual relationship not present in *Blue*).

**6.** Other decisions by the Indiana Court of Appeals lend support to the view that *Plummer* does not accurately state Indiana law on this issue of a private duty. In *Blackburn v. City of Rochester*, 640 N.E.2d 1068 (Ind.App.1994), the plaintiff had been injured when diving into a city pool. The Court of Appeals apparently just assumed that the city owed a duty to the plaintiff. The focus of the appeal was whether the plaintiff had offered evidence of "willful, wanton, or reckless misconduct" so as to avoid a defense of contributory negligence. In *State v. Collier*, 165 Ind.App. 239, 331 N.E.2d 784, 790 (1975), the Court of Appeals held that a person diving into a pool operated by the state had a right to expect a state lifeguard to use reasonable care to stay out of the diver's way. In *Mills v. American Playground Device Co.*, 405 N.E.2d 621, 627 (Ind.App.1980), the Court of Appeals held that a city owed a duty of "ordinary care to make public parks reasonably safe for persons rightfully frequenting and using the parks and equipment."

Cases involving injuries at private swimming facilities also lend support to plaintiffs in this case. In *Dunlap v. Goldwin*, 425 N.E.2d 724, 725 (Ind.App.1981), the focus of the injured swimmer's appeal was a "pure accident" instruction, see *Chaffee v. Clark Equipment Co.*, 496 N.E.2d 84 (Ind.1986) (later rejecting "pure accident" instruction), but the court and the parties assumed that the pool owner owed a duty of reasonable care, including providing accurate depth markings. In *Rouch v. Bisig*, 147 Ind.App. 142, 258 N.E.2d 883, 886 (1970), the Court of Appeals held, and in *Pfisterer v. Grisham*, 137 Ind.App. 565, 210 N.E.2d 75 (1965), the Court of Appeals plainly assumed, that private owners of swimming areas owed a duty of reasonable care to visitors. When a local government operates a pool and charges admissions, it is difficult to see why it should owe its paying customers less of a duty than comparable private businesses owe their customers.

**7.** See also *Aldridge v. Indiana Dep't of Natural Resources*, 694 N.E.2d 313, 316–17 (Ind.App. 1998) (applying *Mullin*, *Plummer*, *Blue*, and *Cain* to hold that state had no private duty to protect fee-paying campers in state park from danger that dead tree would fall on tent in a storm; state employees gave campers no specific assurances that state removed dead trees from camping areas), transfer denied, Oct. 2, 1998.

court did not rely on the absence of negligence, however. Instead it read *Plummer* as holding that no private duty arose in such circumstances. The *Benton* court's discussion of the plaintiff's payment of his fee seems to suggest that a swimmer who pays admission to a swimming area may not rely on the visible presence of lifeguards as an assurance that they will exercise due care, and that no private duty arises unless the swimmer talks with a lifeguard or another city agent who promises to protect that individual swimmer.

For the reasons explained above, this court believes that is a misinterpretation of the decisions of the Supreme Court of Indiana in *Mullin v. South Bend* and *Evansville v. Blue.* Because the Supreme Court of Indiana has granted transfer in *Benton,* however, the appellate court's opinion has been vacated. See *Benton v. City of Oakland,* 698 N.E.2d 1186, 1998 WL 398546 (Ind. Mar. 12, 1998) (table); Ind. R.App. P. 11(B)(3) (if transfer is granted, judgment and opinion of Court of Appeals "shall thereupon be vacated and held for naught. . . .").

The Supreme Court of Indiana may refine the application of the *Mullin* test as applied to lifeguards and public swimming pools when it decides *Benton v. City of Oakland.* In the meantime, however, plaintiffs in this case have come forward with evidence that goes well beyond the evidence presented in the earlier Indiana lifeguard cases. The evidence of the contractual relationship between the City and the Church in this case tends to show that the City assumed a duty to provide competent lifeguards who would use reasonable care to protect the children of the Church's day care program while they swam. The City's motion for summary judgment on the duty issue is accordingly denied.

## II. Design Defect

■ The City next argues that partial summary judgment should be granted on plaintiffs' theory of a design defect in the swimming pool. In their final contentions filed with the court, the plaintiffs allege that the City "failed to exercise ordinary care in the design, construction, and operation of its municipal swimming pool" by failing to provide marginal swimmers or non-swimmers with an area safe for their use, by failing to restrict them to this area, and by failing to have buoyed safety lines in the pool. Dameron and Gasaway base their design defect theory primarily on the testimony of Kamp. He testified that the pool was not designed to accommodate the age group of the day care children:

> That particular swimming pool, to have accommodated that age group, should have had a shallow-end of no more than three-foot depth, and preferably should have been a zero-depth pool. In other words, the shallow-end should have feathered out to zero depth. But that's not uncommon in a pool that age.

Kamp Dep. 72. The City also provided a wading pool that the non-swimmers could have used.

■ Dameron and Gasaway also argue that the City should have placed buoyed safety lines in the swimming pool. The City cites a provision of the Indiana Administrative Code requiring a buoyed safety line to be placed in a pool only when the water depth is over 5 feet. The regulations do not require a safety line at any other location. 410 IAC § 6–2–6(*l*). The Indiana Administrative Code sets only minimum standards, and compliance with an administrative standard is merely evidence of due care. See *Northern Indiana Public Service Co. v. Sell,* 597 N.E.2d 329, 331 (Ind.App.1992) ("Where the unjustified or unexcused violation of a duty prescribed by statute may constitute negligence per se, . . . it does not follow that compliance with a statute or ordinance constitutes the exercise of reasonable care.").

Plaintiffs' evidence of a design defect may not be as intuitively compelling as their evidence of lifeguard negligence, but in view of the standard for summary judgment, there is evidence from which a jury could rationally find a design defect. Summary judgment on this issue is also denied.

## III. Independent Intervening Cause

In a related argument, the City contends that, regardless of whether it negligently designed the pool, the Church's day care per-

sonnel's failure to require Briana to use the wading pool constituted an intervening cause of her drowning, rendering the City not liable. To support this argument, the City relies on Dr. Kamp's testimony that the supervisors of the day care group should have encouraged the "non-swimmers" and "even marginal swimmers" to use the wading pool rather than the main pool.

A plaintiff must prove both cause in fact and proximate cause in a negligence action. E.g., *Bush v. Northern Indiana Public Service Co.*, 685 N.E.2d 174, 178 (Ind. App.1997). A negligent act or omission is the proximate cause of an injury if "the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." *Havert v. Caldwell*, 452 N.E.2d 154, 158 (Ind.1983), quoting *Bridges v. Kentucky Stone Co.*, 425 N.E.2d 125, 127 (Ind.1981). While an actor's negligence may have set "in motion the chain of events" leading to an injury, this chain can be severed by a separate intentional or negligent act, relieving the original actor of liability. *Havert*, 452 N.E.2d at 158. Whether the original actor may be held liable for the ultimate injury depends on the foreseeability of the injury: "the authorities are clear that where the negligent actor's act or omission has the effect of setting in motion the chain of events leading to the injury, the key to holding that act or omission to be the proximate cause of the injury is that the ultimate injury be one that was foreseen, or reasonably should have been foreseen, as the natural and probable consequence of the act or omission." *Id.* The *Havert* court explained the relationship of the doctrine of intervening cause to the foreseeability requirement in further detail:

> An intervening cause, with respect to the doctrine of proximate cause, means, not a concurrent and contributing cause, but a superseding cause, which is itself the natural and logical cause of the harm or the immediate and direct cause of the injury; and where the cause of an injury or death is the negligent act of an independent responsible intervening agency, such act must be regarded as the proximate cause

thereof and the original negligence considered as only the remote cause.

> Where there is an original wrongful act of defendant and an intervening act of a third person, a fundamental test in determining defendant's liability for his wrongful act is the test of foreseeability of the resultant injury, and where the question of an independent intervening agency is involved, one who is charged with negligence cannot be held responsible for the result of such negligence, unless some type of injury and the intervention of the independent agency should have reasonably been anticipated. Similarly stated, where there is an independent responsible agency intervening between the defendant's negligence and the injury, the question whether the original negligence is the proximate cause of the injury is to be determined by whether the agency might have been reasonably expected under the circumstances to intervene in such a way as to be likely to produce an injury similar to the one actually caused.

> Accordingly, if harm is a natural, probable, and foreseeable consequence of the first negligent act or omission, the original wrongdoer may be held liable even though other independent agencies intervene between his negligence and the ultimate result. Generally, where harmful consequences are brought about by intervening and independent forces, the operation of which might have been reasonably foreseen, then the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent forces, and the original wrongful act will be treated as a proximate cause; but, if the new independent intervening force was not reasonably foreseeable at the time of the actor's wrongful conduct, the consequences, ordinarily, are not caused by the original wrongful act.

*Id.* at 158–59, quoting 21 I.L.E. Negligence § 67, at 330–33 (1959). The allegedly negligent conduct of a defendant will not be the proximate cause of an accident if an unforeseen superseding negligent act intervened to directly cause the harm. *Miller v. Faulkner*, 506 N.E.2d 52, 56 (Ind.App.1987).

In general, proximate cause is a question of fact for the jury's determination. *Bush,* 685 N.E.2d at 178. The question of causation can be decided as a question of law, but only if "a single conclusion can be drawn from the facts." *Id.* To defeat the design defect theory on this basis, the City must prove that the facts in this case lead to the "single conclusion" that the Church's day care staff's failure to require Briana to use the wading pool was unforeseeable. The City has failed to clear this hurdle. Lifeguards and those operating a swimming pool can and should easily foresee the risk that adults supervising young children may make mistakes about a child's ability in the water and may otherwise fail to exercise due care in supervising a child. After all, what are the lifeguards doing at the pool?

The City points to two Indiana cases in support of its argument that it should be relieved of liability for the alleged design defect of the pool. In both *Bush v. Northern Indiana Public Service Co.,* 685 N.E.2d 174 (Ind.App.1997), and *Miller v. Faulkner,* 506 N.E.2d 52 (Ind.App.1987), the appellate court affirmed summary judgment for the defendants on the basis that subsequent actions of others superseded the defendants' liability. In *Bush,* the plaintiff alleged that governmental entities had negligently designed and maintained the road where the decedent had an automobile accident. The appellate court found that the accident was not caused by road design or maintenance, but by the driver's "intentional act of driving almost twice the posted speed limit and reckless driving." 685 N.E.2d at 178. In *Miller,* the decedent's estate alleged that Indiana had negligently designed an intersection and that the posted speed limit was too high for the road where the accident occurred. The court found that the design of the road did not cause the accident, but that the driver's intentional act of trying to "beat" a truck to the intersection caused the accident. 506 N.E.2d at 56 & n. 1.

Unlike *Bush* and *Miller,* where the facts supported the single conclusion that it was the drivers' conduct that constituted the natural and logical cause of the harm, a reasonable jury could find here that it was reason- ably foreseeable that supervisors of children might not require marginal swimmers or non-swimmers to use a wading pool. Dr. Kamp testified that there "are a lot of people who simply will not use the wading pool, people who are old enough or large enough that they don't feel that they should be using a wading pool." Kamp Dep. at 86. The issue of whether the alleged negligence of the City, the Church, or both proximately caused Briana's death should be decided by the trier of fact. The court cannot conclude as a matter of law that the Church's day care staff's failure to require Briana to use the wading pool was an intervening cause that would relieve the City of liability for Briana's death based on any design defect in the pool. (Also, of course, the Church staff's failure to require Briana to use the wading pool cannot be an intervening, superseding cause of any negligence on the part of the lifeguards, since the allegedly negligent act of the Church's staff could not supersede the lifeguards' later failure to observe Briana.) The City's mo- tion for summary judgment on this ground is denied.

## IV. Indiana Tort Claims Act: Notice and Limitation of Recovery

### A. Gasaway's Failure to Provide Timely Notice

The City also argues that plaintiff Lowell Gasaway's claim against it is barred because he did not file his own proper and timely notice of a tort claim. As an action against the City of Scottsburg, a political subdivision, this case is governed by the Indiana Tort Claims Act, Ind.Code § 34–4– 16.5–1 et seq. (This Act is now found at Ind.Code § 34–13–3–1 et seq.) The Indiana Tort Claims Act provides that "a claim against a political subdivision is barred un- less notice is filed with the governing body of that political subdivision within … 180 days after the loss occurs." Ind.Code § 34–4– 16.5–7. It is undisputed that Dameron and the estate of Briana timely filed a notice of tort claim but that Gasaway did not file his own notice of tort claim.

Whether a plaintiff has complied with the Indiana Tort Claims Act is not a question of fact for the jury but an issue of

law for the court to determine. In *City of Indianapolis v. Satz*, 268 Ind. 581, 377 N.E.2d 623, 625 (1978), the Indiana Supreme Court explained:

> The question of compliance with the statute is not a question of fact for the jury. It is a procedural precedent which need not be pleaded but may be raised as a defense in a responsive pleading. If so raised the plaintiff then has the burden of proving compliance. The trial court must make the determination of whether proper notice was given and must do so prior to trial.

See also *Indiana Carpenters Central and Western Indiana Pension Fund v. Seaboard Surety Co.*, 601 N.E.2d 352, 357 (Ind.App.1992) (quoting *Satz*), and *City of Tipton v. Baxter*, 593 N.E.2d 1280, 1283 (Ind.App.1992) (quoting *Satz*).

The Indiana appellate courts have held that a claimant may not rely upon the notice given by another party, but must serve the governmental entity with his own notice of a tort claim in order to preserve his cause of action. In *Rosga v. City of Hammond*, 493 N.E.2d 787, 789 (Ind.App.1985), the court affirmed summary judgment for the city on the ground that the plaintiff failed to file a notice of tort claim against the governmental entity. The case involved an automobile accident where four people were killed and the plaintiff was injured. Three of the decedents' estates had given timely notice to the city of their tort claims. The plaintiff argued that the statutory notice requirement had been fulfilled because the notice of tort claim submitted by the other decedents' estates referred to plaintiff's injury and her husband's death arising from the accident. The court rejected this argument: "We find [no case] . . . permitting a party to rely upon the notice of a claim given by some other party for that party's claim arising out of the same occurrence. . . . We conclude that no notice was given by, or on behalf of, the claimant by any authorized representative, and that such notice was necessary to enable the claimant to maintain the action." *Id.*

Similarly, in *Putnam County v. Caldwell*, 505 N.E.2d 85, 87 (Ind.App.1987), the court concluded that a wife's claim of loss of consortium was barred because she did not file a notice of tort claim even though her husband had timely filed his notice of a personal injury claim. Her husband was injured while riding in a motor vehicle owned by the county. When he filed his suit for damages, he joined his wife as a plaintiff for loss of consortium. The court explained why the wife's claim was barred:

> [The wife] gave no tort claim notice at all, and [her husband's] notice failed to mention her, or her claim, in any way. Loss of consortium is an independent cause of action. Though derivative in a sense, a successful suit by the injured party is not a prerequisite to recovery for loss of consortium. Failure to file the notice within 180 days of the injury bars the action. [The wife] argues that since the cause of action is derivative, her claim is not barred. She presents no authority which so holds.

> \* \* \* \* \* \*

> [T]he purpose of the notice provision is to give the public body prompt notice of its exposure to liability. The names and number of claimants are essential. . . . Here, until the complaint was filed, the Public Body would not know that [the wife] existed, or if it did, that she contemplated filing a claim. Knowledge that the accident occurred is not sufficient. Failure to give notice as required is fatal to the action.

*Id.* (citations omitted). The court therefore reversed the trial court's denial of summary judgment for the defendant.

Plaintiffs argue that *Rosga* and *Caldwell* do not control this case because they did not involve a single, indivisible action, while the statute governing claims for the wrongful death of a child provides a "unitary cause of action." Pl. Br. at 23. Plaintiffs rely on the following points to support their argument that this action is indivisible: (1) the statute provides that when a child's parents are divorced, the custodial parent may maintain an action for the wrongful death of the child, Ind.Code § 34–1–1–8(b)(2) (1995); Ind.Code § 34–23–2–1(b)(2) (1998); (2) the Indiana Court of Appeals has observed that, because the legislature intended that only one action be maintained for the wrongful death of a

child, the custodial parent who brings the action must name the noncustodial parent as a necessary party, see *King v. King,* 610 N.E.2d 259, 264 n. 8 (Ind.App.1993); and (3) the statute also allows the trial court to apportion damages recovered from the action between both the custodial parent and the noncustodial parent, Ind.Code § 34–1–1–8(h)(2) (1995); Ind.Code § 34–23–2–1(h)(2) (1998).

From the premise that an action for the wrongful death of a child is "indivisible," plaintiffs then rely on *City of Columbus v. Goodnow,* 91 Ind.App. 6, 169 N.E. 885 (Ind. App.1930), to conclude that Gasaway did not need to file his own tort claim notice. In *Goodnow,* the widow filed her tort claim notice, but signed as "the widow of the deceased" rather than "the administratrix of his estate." *Id.* at 885. The court held that her tort claim notice was sufficient:

> The city is bound to know that, by statutory regulation, an action for wrongful death maintained by the personal representative inures solely to the widow and children, if any, or next of kin in this case, there being no such heirs other than the widow, solely to her benefit, and that she had the only claim which might arise from such wrongful death, and that the prosecution of such claim was, in a legal way, properly by the personal representative.

*Id.* at 886.

*Goodnow* seems to rest on the desire not to apply "draconian" rules. In some circumstances, the Indiana courts have held that substantial compliance with the notice requirements is sufficient when the purposes of the notice requirement are satisfied, including "informing the officials of the political subdivision with reasonable certainty of the accident and surrounding circumstances so that political division may investigate, determine its possible liability, and prepare a defense to the claim." E.g., *Indiana State Highway Comm'n v. Morris,* 528 N.E.2d 468, 471 (Ind.1988). Substantial compliance with the notice requirement may exist where plaintiffs make technical errors that do not prejudice the governmental defendant. See *id.* (holding that plaintiffs substantially complied with the notice requirement where they

sent a notice of tort claim to the Commission, and the Commission forwarded copies of the notice to the Attorney General within the 180 day limit of the Statute (even though the plaintiffs were supposed to send notice to the Attorney General themselves)); *Caldwell,* 505 N.E.2d at 87 (declining to follow the court's holding in *City of Fort Wayne v. Bender,* 57 Ind.App. 689, 105 N.E. 949 (1914), that a ten day discrepancy between the date of the accident and the date stated in the notice was fatal, and stating that such a rule was "draconian").

In *Goodnow,* the plaintiff did not correctly label her signature, but the defendant must have known that she was bringing the wrongful death action. Here, in contrast, the notice indicated that only Dameron was bringing a wrongful death action for Briana's death. The City was not necessarily put on notice that Gasaway would also join in this action simply because the statute authorizing actions for the wrongful death of a child allows damages to inure to the benefit of both parents. To prove that he suffered damages resulting from the City's asserted negligence, Gasaway would need to come forward with evidence showing the effects of Briana's death on him individually, in terms of the statutory elements of loss of services, loss of love and companionship, and reimbursable expenses. His evidence of such losses would be separate and distinct from Dameron's evidence about her similar losses. Notice from Dameron to the City that she intended to seek damages for her losses resulting from Briana's death therefore did not put the City on notice that Gasaway would also be asserting similar claims based on his losses. To recover damages for the losses he suffered, the noncustodial parent must still "timely and affirmatively assert his . . . interest in a share of any wrongful death of child damages recovered" (so long as he has notice of the custodial parent's wrongful death claim). *King,* 610 N.E.2d at 264. Gasaway failed to timely assert his interest in this matter. Under Indiana law, the error was more than a mere technicality.

Finally, plaintiffs also rely on *Budden v. Board of School Comm'rs of City of Indianapolis,* 698 N.E.2d 1157, 1163 (Ind.1998),

which held that a tort claim notice was sufficient in a class action where several named plaintiffs sent a notice informing the governmental body that they had been wronged and that they intended to assert claims on behalf of an identifiable class, but did not specifically identify all potential plaintiffs. The court in *Budden* was careful to frame the issue in terms of a notice that would give the governmental body fair notice of the scope of the claims asserted: "Does a Tort Claims Act notice by a putative class representative that fairly signals an intent to assert a class claim, but does not list all potential plaintiffs, comply with the notice requirement to preserve claims of class members if a class is subsequently certified under Trial Rule 23?" *Id.* at 1158. In this case, Dameron's notice did not put the City fairly on notice that Gasaway, Briana's noncustodial parent, would join in this action and assert his own claim for damages. *Budden* does not apply to this situation.

Accordingly, Gasaway's claim for Briana's wrongful death against the City is barred because he cannot rely on Dameron's notice to the City. Gasaway may still pursue his wrongful death claim against the Church.

### B. $300,000 Limit for the Death of One Person

The City's final argument—that the Tort Claims Act limits Dameron's and Gasaway's combined recovery to $300,000—is obviously correct, see Ind.Code § 34–4–16.5–4 (1995); Ind.Code § 34–13–3–4 (1998), but is now moot because Gasaway's claim against the City is barred by the lack of notice.

### Conclusion

For the reasons set forth above, the City's motion for summary judgment is DENIED with respect to its theories that it did not owe a special duty to Briana, that it did not negligently design the pool, and that the Church's conduct constituted an intervening cause of Briana's death. The City's motion is GRANTED as to Lowell Gasaway's claim against it because Gasaway failed to comply with the notice requirement of the Indiana Tort Claims Act. The City's final ground for summary judgment, based on the Tort Claims Act recovery limitation, is moot. Trial remains scheduled for January 26, 1999.

So ordered.